XAVIER BECERRA
Attorney General of California
ANNADEL A. ALMENDRAS
Supervising Deputy Attorney General
MYUNG J. PARK, SBN 210866
SARA D. VAN LOH, SBN 264704
GARY ALEXANDER, SBN 167671
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3504
 Fax:  (415) 703-5480
 E-mail:  Myung.Park@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>Plaintiff,<br><br>v.<br><br>**CHARLTON H. BONHAM, in his official capacity as Director of the California Department of Fish and Wildlife,**<br>Defendant. | Case No. 3:17-cv-05685-MMC<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:  February 8, 2019<br>Time: 9:00 a.m.<br>Dept: Courtroom 7, 19th Floor<br>Judge: Hon. Maxine M. Chesney |

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES ................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

    I.     Requirements of California's Commercial Dungeness Crab Fishers .................... 2

    II.    CDFW is Working to Address Marine Entanglements ........................................ 3

         A.    The California Dungeness Crab Fishing Gear Working Group ................. 3

         B.    Legislative Efforts ................................................................................. 6

    III.   III. Reported Entanglements Have Been Significantly Decreasing ...................... 7

ARGUMENT ................................................................................................................... 9

    I.     Summary Judgment Standard ........................................................................... 9

    II.    Proximate Cause Must Be Established For "Take" Liability Under Section
         9 of the ESA ..................................................................................................... 9

         A.    Section 9 of the Endangered Species Act ............................................... 10

         B.    Proximate Cause Cannot Be Based on an Agency's Non-
            discretionary Actions ............................................................................ 10

         C.    The Logic of *Public Citizen*, *Home Builders*, and *NRDC* Apply
            Here ..................................................................................................... 14

    III.   CBD HAS FAILED TO ESTABLISH CAUSATION AS ALL OF ITS
         CITATIONS ARE TO DISCRETIONARY AGENCY ACTION CASES ......... 15

         A.    *Strahan* Is A Discretionary Agency Action Case And Is Also Not
            Binding Precedent ................................................................................. 15

         B.    All Of The Cases Relied On By CBD Show Discretionary Agency
            Actions ................................................................................................. 17

    IV.   EVIDENTIARY OBJECTIONS ....................................................................... 21

         A.    Exhibit 2 – Objection: Hearsay .............................................................. 21

         B.    Exhibit 8 – Objection: Hearsay .............................................................. 22

         C.    Exhibit 9 – Objection: Hearsay .............................................................. 23

         D.    Exhibit 12 – Objection: Hearsay ............................................................ 23

         E.    Exhibit 13 – Objection: Relevance, Lack of Foundation, Hearsay ........... 24

         F.    Exhibit 14 – Objection: Relevance, Lack of Foundation, Hearsay ........... 24

         G.    Exhibit 15 – Objection: Relevance, Lack of Foundation, Hearsay ........... 25

CONCLUSION ............................................................................................................... 26

i

**TABLE OF AUTHORITIES**

Page

CASES

*Animal Protection Institute, Center for Biological Diversity v. Holsten*
    541 F.Supp.2d 1073 (D. Minn. 2008) ...................................................................18

*Animal Welfare Institute v. Martin*
    588 F.Supp.2d 70 (D. Me. 2008) ..........................................................................19

*Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon* (*Babbitt*)
    515 U.S. 687 & 700 ..............................................................................................10

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)................................................................................................9

*Center for Biological Diversity v. Otter*
    No. 1:14-CV-258-BLW ........................................................................................20

*Defenders of Wildlife v. Administrator, E.P.A.*
    882 F.2d 1294 (8th Cir. 1989)..........................................................................16, 17

*Department of Transp. v. Public Citizen* (*Public Citizen*)
    541 U.S. 752 (2004) ....................................................................................... *passim*

*Greenwich Ins. Co. v. Media Breakaway, LLC*
    No. CV08-937 CAS, 2009 U.S. Dist. LEXIS 63454 (C.D. Cal. Jul. 22, 2009)..........................9

*Loggerhead Turtle v. County Council of Volusia County*
    896 F.Supp. 1170 (M.D. Fla. 1995) ......................................................................18

*Metropolitan Edison Co. v. People Against Nuclear Energy*
    460 U.S. 766 (1983)..............................................................................................10

*National Ass'n of Home Builders v. Defenders of Wildlife* (*Home Builders*)
    551 U.S. 644 (2007) ....................................................................................... *passim*

*Natural Resources Defense Council v. Norton* (*NRDC*)
    236 F.Supp.3d 1198 (E.D. Cal. 2017)............................................................. *passim*

*Oregon Natural Desert Ass'n v. Tidwell*
    716 F.Supp.2d 982 (D. Or. 2010) ....................................................................20, 21

*Red Wolf Coalition v. N.C. Wildlife Res. Comm'n*
    No. 13-60-BO, 2014 U.S. Dist. LEXIS 65601 (E.D.N.C. May 13, 2014)................19

*Sierra Club v. Von Kolnitz*
  2017 U.S. Dist. LEXIS 128462 (D.S.C., Aug. 14, 2017, No. 2:16-CV-03815-
  DCN) ..................................................................................................................18, 19

*Strahan v Coxe* (*Strahan*)
  127 F.3d 155 (1st Cir. 1997) ....................................................................15, 16, 17

**FEDERAL STATUTES**

Clean Water Act..............................................................................................12, 13

Endangered Species Act, 16 U.S.C. § 1531 (1988 ed. and Supp. V)..........................10
  § 7........................................................................................................11, 12, 13
  § 9.......................................................................................................... *passim*

Federal Rules of Civil Procedure
  56...........................................................................................................................1
  56(a) ......................................................................................................................9

National Environmental Policy Act (NEPA) ......................................................11, 12

United States Code
  Title 7 § 136a(c)(2)(B)......................................................................................17
  Title 16 § 1532(19)............................................................................................10
  Title 16 § 1538(a)(1) .........................................................................................10

**FEDERAL REGULATIONS**

50 C.F.R.
  § 17.3 .................................................................................................................10
  § 223.213 ...........................................................................................................10

**CALIFORNIA STATUTES**

California Fish and Game Code
  § 702...................................................................................................................14
  § 7850............................................................................................................3, 14
  § 7852............................................................................................................3, 14
  § 7852) ................................................................................................................3
  § 7852.25 .............................................................................................................3
  § 8276.1(c) ..........................................................................................................7
  § 8276.5(a) ...................................................................................................3, 14, 15
  § 8280............................................................................................................3, 14
  § 8280.1........................................................................................................3, 14, 15

# TABLE OF AUTHORITIES
### (continued)

**Page**

Senate Bill
    1309....................................................................................................................3, 7

**CALIFORNIA REGULATIONS**

California Code of Regulations, Title 14
    § 132.1............................................................................................................3
    § 132.3............................................................................................................3
    § 132.6............................................................................................................5

**OTHER STATE STATUTES**

Code of Massachusetts Regulations Title 322
    § 7.01 (3).......................................................................................................16
    § 7.01 (4).......................................................................................................16
    § 7.01 (7).......................................................................................................16

Idaho Code, § 36-103(b) ...........................................................................................20

Me. Rev. Stat. Title 12, § 11101 ..............................................................................19

Minn. Stat. Ann. § 97B.605 (West 2005) .................................................................18

N.C. Gen. Stat. Ann. § 113-274 (West 2013) ...........................................................19

**OTHER AUTHORITIES**

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of
    Torts* (5th ed.1984)....................................................................................10

## <u>NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT AND</u>

## <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

**PLEASE TAKE NOTICE** that on February 8, 2019, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 7 of the Phillip Burton Federal Building and United States Courthouse, at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendant Charlton H. Bonham, in his official capacity as Director of the California Department of Fish and Wildlife (CDFW), will move and hereby does move this Court for summary judgment in his favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The Court should grant CDFW's cross-motion for summary judgment and deny Plaintiff Center for Biological Diversity's motion for summary judgment because CDFW is entitled to judgment as a matter of law for the claims in this case. Therefore, the Court should grant CDFW's cross-motion for summary judgment and dismiss the case in its entirety with prejudice.

This motion is based on the Notice of Motion, the supporting Memorandum of Points and Authorities, and the declarations and exhibits attached thereto, the supporting Request for Judicial Notice, all pleadings and documents on file in this action, and such oral and documentary evidence as may be presented at or before the hearing on the Motion.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## <u>STATEMENT OF ISSUES</u>

Defendant Charlton H. Bonham, in his official capacity as Director of the California Department of Fish and Wildlife, has been working with the California Legislature, the commercial fishing industry, and environmental groups to ensure better protection of federally-listed species (namely, the humpback whale, blue whale, and Pacific leatherback sea turtle) from entanglement in crab gear laid down along the coast of California in the commercial Dungeness crab fishery. In fact, recent efforts by CDFW with other environmental groups and industry stakeholders have occurred during the same time period in which such entanglements have greatly decreased. In the case of the Blue Whale and Pacific leatherback sea turtle, according to the data provided by CBD, no entanglements have been reported for 2018.

In spite of these reductions in entanglement cases and ongoing efforts to protect federally-listed species, Plaintiff Center for Biological Diversity (CBD or Plaintiff CBD) seeks to hold CDFW vicariously responsible for harm that has befallen these endangered or threatened species due to alleged past and foreseeable future entanglements in commercial Dungeness crab gear. CBD asserts that CDFW's role in the "authorization, permitting, licensing, overseeing, and management of the California commercial Dungeness crab fishery" renders CDFW vicariously liable for the unlawful "take" of threatened and endangered species in violation of the Endangered Species Act (ESA). CBD Mem. of Points and Authorities in Support of Mot. For Summary Judgment (CBD MSJ) at 19.

However, under California law for the time period at issue here, CDFW has had no ability to exercise discretion when issuing commercial fishing licenses and permits. California statutes *require* CDFW to issue these licenses and permits upon receipt of a proper application. Issuing such licenses and permits is not discretionary.

In other contexts, the United States Supreme Court has held that non-discretionary actions by an agency cannot be the proximate cause for events that trigger certain environmental statutes. Here, the Court should likewise conclude that CDFW's non-discretionary issuance of commercial fishing licenses and permits cannot be the proximate cause of a "take," and that those acts accordingly do not violate the ESA. Applying this reasoning, there is no genuine dispute as to CDFW's non-discretionary authority and CDFW is entitled to summary judgment on CBD's claim as a matter of law.

## STATEMENT OF FACTS

### I. Requirements of California's Commercial Dungeness Crab Fishers

The California Legislature has been specific and precise in its efforts to manage the commercial Dungeness crab fishery in California. For example, the Legislature's enactments within California's Fish and Game Code (Code) require each commercial Dungeness crab fisher to obtain from CDFW a commercial fishing license, a Dungeness crab vessel permit, a biennial Dungeness crab trap permit, and the entire number of buoy tags associated with the crab trap tier level for the vessel permit. Cal. Fish & Game Code §§ 7850, 8280, 8280.1, 8276.5(a)(3) (West

2

2013 & Supp. 2018).  The Legislature has mandated that CDFW must issue the licenses and permits, without discretion, when the applicant has fulfilled the applicable requirements.  Cal. Fish & Game Code § 7852, 8280.1(b)-(d) (West 2013).

As discussed in more detail below, the Legislature has recently broadened CDFW's legal authority over the commercial Dungeness crab fishery effective January 1, 2019, with the enactment of Senate Bill 1309 ("SB 1309").[1]  But for purposes of CBD's pending motion relating to allegations of past entanglements, CDFW has been operating solely under the framework set forth above – with no discretion over the permitting process.  For example, under Fish and Game Code section 7852, CDFW must issue a license for commercial fishing upon the applicant meeting certain conditions.  Cal. Fish & Game Code § 7852 (West 2013).  Under Fish and Game Code section 8280.1, CDFW must issue a Dungeness crab vessel permit for commercial fishing upon the applicant meeting certain conditions.  Cal. Fish & Game Code § 8280.1 (West 2013); Cal. Fish & Game Code § 8276.5(a)(3) (West Supp. 2018); *see also* implementing regulations at Cal. Code Regs. tit. 14, §§ 132.1 & 132.3 (2018).

Upon the applicant meeting the listed conditions, CDFW can deny issuance of a license or permit only if the applicant has a prior history of providing a dishonored check and failed to reimburse CDFW.  Cal. Fish & Game Code § 7852.25 (West 2013).  Once CDFW performs its statutorily mandated duty to issue the necessary licenses, permits, and buoy tags, it is not involved in the array of additional discretionary decisions that go into the full implementation and management of the fishery.

## II.      CDFW is Working to Address Marine Entanglements

### A.      The California Dungeness Crab Fishing Gear Working Group

#### 1.      Improving Fishing Gear

During the time at issue in this lawsuit, CDFW did not have the discretion or legal authority to deny commercial Dungeness crab licenses and permits if timely payment for them was made.  However, CDFW took significant steps (and continues to take significant steps) within its legal

---

[1] See accompanying Request for Judicial Notice and Exhibit 1 to Declaration of Myung J. Park.

authority to make sure that necessary fishing gear was as safe as possible for marine species. (*See* Declaration of Dr. Craig Shuman at ¶ 3, attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.) Specifically, CDFW exhausted its options within its minimal statutory authority, all of which pertained to fishing gear, in addition to maximizing every opportunity for leadership and education while recognizing its lack of discretion to deny or condition licenses and permits.

For example, CDFW convened the California Dungeness Crab Fishing Gear Working Group in September of 2015. This Working Group was undertaken in partnership with the California Ocean Protection Council and the National Marine Fisheries Service. The goal of the Working Group was (and remains) to address an increase in large whale entanglements which were claimed to have involved Dungeness crab fishing gear. The Working Group is comprised of commercial and recreational fishermen, environmental organization representatives,[2] members of the disentanglement network, and state and federal agencies. (*See* Declaration of Dr. Craig Shuman at ¶ 3(a), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.) The Working Group's multi-pronged charge is to:

- Provide guidance and recommendations to the California Dungeness crab fishing industry, including the Dungeness Crab Task Force, about how to avoid or minimize whale entanglements and identify measures or experiments that can be developed or implemented by the fishing community to address the entanglement issue. (*See* Declaration of Dr. Craig Shuman at ¶ 3(c)(i), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)

- Collaboratively inform and guide state agencies regarding key information gaps and/or measures to reduce the risks of entanglements in Dungeness crab fishing gear. (*See* Declaration of Dr. Craig Shuman at ¶ 3(c)(ii), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)

///

///

_____

[2] CBD used to be a member of this Working Group, but nonetheless has failed to mention its existence in its moving papers. (*See* Declaration of Dr. Craig Shuman at ¶ 3(b), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)

4

- Guide whale entanglement reduction efforts by establishing priorities for the Working Group, and help inform other entities seeking to address the issue of whale entanglements in California. (*See* Declaration of Dr. Craig Shuman at ¶ 3(c)(iii), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)

After significant time and effort were invested over the years, the Working Group has produced notable results.[3]  For example, the Working Group has established "best practices" for the use of commercial Dungeness crab fishing gear. (*See* Declaration of Dr. Craig Shuman at ¶ 3(d), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.) *See also* https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=117872&inline.[4]

Additionally, as a direct outcome of input from the Working Group, CDFW implemented a new set of regulations, effective October 30, 2018, to reduce the risk of marine entanglements in commercial Dungeness crab fishing gear. Cal. Code Regs. tit. 14, § 132.6.[5] (*See* Declaration of Dr. Craig Shuman at ¶ 3(e), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)  This new regulation expressly addresses one of CBD's stated concerns in moving for summary judgment. (CBD MSJ at 5-6.)

## 2. Identifying Risk Factors – the RAMP

Most significantly, the Working Group convened by CDFW developed a pilot program called the RAMP – the Risk Assessment and Mitigation Program – to reduce entanglement risk:

> Since September 2015, the California Dungeness Crab Fishing Gear Working Group (Working Group) has been taking steps to actively identify and be responsive to elevated risks of whale entanglements in California Dungeness crab fishing gear.

* * *

///

///

---

[3] A profile of this Working Group, its goals, and its accomplishments are catalogued on its website: http://www.opc.ca.gov/whale-entanglement-working-group/ . *See* accompanying Request for Judicial Notice and Exhibit 2 to Declaration of Myung J. Park.
[4] *See* accompanying Request for Judicial Notice and Exhibit 3 to Declaration of Myung J. Park.
[5] *See also* https://cdfgnews.wordpress.com/2018/11/15/new-regulations-for-commercial-dungeness-crab-fishery-effective-oct-30-2018/; *see also* accompanying Request for Judicial Notice and Exhibit 4 to Declaration of Myung J. Park.

[T]he Working Group has been working to better understand the issue of entanglements and to identify methods to mitigate entanglement risk. [T]he group identified the need for a process that could help identify circumstances that can elevate risk and develop pathways to addressing these situations. The Working Group has considered an approach that is rooted in best fishing practices and is flexible to be responsive to elevated entanglement risk. Involving a range of experts — agencies, fishermen, researchers, and others—who will work collaboratively to evaluate risk, identify information needs, and assess the need for voluntary and/or (longer-term) mandatory management options that could be recommended to California Department of Fish and Wildlife (CDFW) is key to the program's success.

(*See* Declaration of Dr. Craig Shuman at ¶ 4), attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.) *See also*

http://www.opc.ca.gov/webmaster/_media_library/2016/08/CAWorkingGroup_RAMPOverview_October2017.pdf [6]

The RAMP was rolled out as a voluntary program for the 2017-2018 Dungeness crab season. Fishers who volunteered to participate in the program provided data about fishing conditions to the Core Team who could then develop a risk assessment. The risk assessment was designed, if necessary, to lead to management measures such as delays in fishing season openings, or even partial in-season closures if appropriate. However, CDFW did not have the legal authority to make this program mandatory. CDFW relied on volunteer compliance by the fishery and anticipated that the California Legislature would make it a statutory requirement if the RAMP proved effective. Even though not mandatory, the RAMP has provided data to assist in understanding and evaluating entanglement risk factors moving forward. (*See* Declaration of Dr. Craig Shuman at ¶¶ 4-5, attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)

## B. Legislative Efforts

Finally, CDFW has taken significant steps to obtain additional statutory authority to take even more action to eliminate entanglements and the threats of entanglement. In fact, SB 1309 was enacted as a result of CDFW's investment and leadership in moving interested parties to a more pro-active approach. Known officially as the Fisheries Omnibus Bill of 2018 and effective

---

[6] *See* accompanying Request for Judicial Notice and Exhibit 5 to Declaration of Myung J. Park.

on January 1, 2019, SB 1309 has made dramatic strides in giving CDFW the authority and discretion it needs to reduce the risks of entanglements in fishing gear. (*See* Declaration of Dr. Craig Shuman at ¶ 6, attached as Exhibit 6 to the accompanying Declaration of Myung J. Park.)[7]

SB 1309 acknowledges that the Legislature had not historically given CDFW the discretion or authority it desired to address entanglements. The Legislature recognized that "[i]n order to effectively manage the risk of entanglement, ***the Department of Fish and Wildlife needs the ability*** . . . to address significant risks to marine life . . . ." SB 1309, at section 2(e). SB 1309 seeks to change that and empower CDFW's Director – but only starting on January 1, 2019, and only until CDFW implements regulations to address entanglements, a rulemaking process which must be completed no later than November 1, 2020.

After January 1, 2019, for the first time CDFW will have specific, statutory legal authority and discretion to require mandatory action by the commercial Dungeness crab industry to address entanglements. In fact, until new regulations are later implemented, SB 1309 empowers CDFW's Director to "restrict the take of Dungeness crab in those areas where that risk [of entanglement] has been determined to exist, including through time or area closures, or both." Fish & Game Code § 8276.1(c) (newly enacted and added as part of SB 1309).

## III.   Reported Entanglements Have Been Significantly Decreasing

CBD points to reports from unknown sources collected by the National Marine Fisheries Service (NMFS) showing that certain marine mammal species have become entangled in fishing gear reported to be associated with California fishers who fish commercially for Dungeness crab.[8]

---

[7] *See* accompanying Request for Judicial Notice and Exhibit 6 to Declaration of Myung J. Park.

[8] See, e.g., CBD's Exhibit 12 from which it obtains much of the data to support its motion. The author of the report is known however the source of the data is not. Indeed, the report itself affirms that its data is second-hand or third-hand information from other groups or from other individuals. "Sources of injury data include strandings, disentanglement networks, the public, researchers, and fishery observer programs." CBD Exhibit 12 at p. 1. Similarly, Exhibit 9, CBD's data source for blue whale entanglement, specifically acknowledges the unreliability of its data through the risk of over-reporting where multiple people or entities may report the same entanglement. CBD Exhibit 9 at p. 1.

CBD's motion is factually premised primarily on this hearsay data set collected by the NMFS.[9]

Summarized succinctly, CBD's reported data about entanglements is as follows:

**CBD's Entanglement Data**

| Species | 2014 | 2015 | 2016 | 2017 | 2018[10] |
|---|---|---|---|---|---|
| **Humpback Whale** | 2 | 7 | 19 | 3 | 3 |
| **Blue Whale** | 0 | 0 | 2 | 1 | 0 |
| **Leatherback Sea Turtle** | 0 | 0 | 1 | 0 | 0 |

Any single entanglement of a listed species is too many. However, honoring that fact, in turn, requires taking a hard look at the data to ensure it is properly understood. The data submitted by CBD shows several key points.

Regarding the humpback whale, the number of reported entanglements peaked in 2016, according to CBD's data. The very next year, the reported entanglement numbers decreased precipitously by 85% from 19 to 3. According to the data CBD has submitted with its motion, no increases in reported entanglements have thereafter been observed.

Regarding the blue whale, CBD's data shows a decline from two reported entanglements in 2016, to a single reported entanglement in 2017, to zero reported entanglements so far for 2018. As for the Pacific leatherback sea turtle, CBD's data shows that there has been a single reported

---

[9] The accuracy and reliability of reports by unknown third parties undercuts the reliability of the data. Indeed, in CBD's Exhibit 16, NOAA Fisheries West Coast Region prepared a response to an inquiry by State Senator McGuire. In that response, NOAA stated it had 35 reports of entangled whales in 2016 – although only 15 sightings were confirmed. NOAA further admitted that there was over-reporting – stating that at least 7 of the 35 claimed sightings were "re-sights of whales already included in the 15 confirmed reports." This underscores the point that CBD's data, as presented in this motion, is inherently flawed and unreliable.

[9] Section IV, below, contains more formal evidentiary objections.

[10] CBD states this number for 2018 is preliminary, presumably because 2018 has not yet concluded. CBD MSJ at 12:8-10.

entanglement in five years. Since that single reported entanglement in 2016, the number of reported entanglements has decreased to zero, as with the blue whale.[11]

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment." *Greenwich Ins. Co. v. Media Breakaway, LLC*, No. CV08-937 CAS (CTx), 2009 U.S. Dist. LEXIS 63454, at *13 (C.D. Cal. Jul. 22, 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 323).

### II. Proximate Cause Must Be Established For "Take" Liability Under Section 9 of the ESA

Plaintiff CBD's sole claim for relief is that CDFW is responsible for harm to certain ESA-listed whales and sea turtles when they become entangled in California commercial Dungeness crab gear. CBD Complaint, § 84. CBD argues that CDFW's "authorization, permitting, licensing, overseeing, and management of the California commercial Dungeness crab fishery" have caused the "take" of certain listed species in violation of section 9 of the ESA. *Id*. CBD relies on cases that show state agencies (or officials) being found liable for "take" of protected species when the agencies authorize activities that result in the species being harmed or killed. CBD MSJ at 17-18.

However, in order for a governmental agency to be found responsible for a "take" in violation of section 9 of the ESA for authorizing such activities, the agency's actions must be the

---

[11] The declining numbers of reported entanglements of humpback whales, blue whales, and Pacific leatherback sea turtles correspond temporally with the efforts of the Working Group to understand the causes and dynamics of entanglements and to take steps (based on that understanding) to reduce and eliminate them.

proximate cause of the "take." *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon* (*Babbitt*), 515 U.S. 687, 696, n. 9 & 700, n. 13 (1995). Even assuming CBD's allegations are true that certain listed whales and sea turtles are being harmed by California commercial Dungeness crab gear, the claim must fail because CDFW's actions are not the proximate cause of the "take."

### A. Section 9 of the Endangered Species Act

The Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. § 1531 (1988 ed. and Supp. V), is designed to protect certain species that the Secretary of the Interior has designated as endangered or threatened. Section 9 of the ESA makes it unlawful for any person to "take" any endangered or threatened species. 16 U.S.C. § 1538(a)(1) (2000); 50 C.F.R. § 223.213 (2017). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (2000). "*Harm* in the definition of 'take' in the [ESA] means an act which actually kills or injures wildlife. 50 CFR § 17.3 (1994).

The Supreme Court has linked section 9 "take" liability to the common law doctrine of proximate causation. *Babbitt,* 515 U.S. at 697, n. 9 (violation of section 9 should be read to "incorporate ordinary requirements of proximate causation and foreseeability"). For proximate causation analysis, "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774, n. 7 (1983); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts*, 264, 274–275 (5th ed.1984) (proximate cause analysis turns on policy considerations and considerations of the "legal responsibility" of actors).

### B. Proximate Cause Cannot Be Based on an Agency's Non-Discretionary Actions

CBD has cited to no U.S. Supreme Court or Ninth Circuit cases to support its position that CDFW is liable for a "take." This is because neither the U.S. Supreme Court nor the Ninth Circuit Court of Appeals has ever evaluated under what circumstances an agency's actions might

be a "take" under section 9 of the ESA.  But, the Supreme Court has determined that non-discretionary actions by an agency cannot be the legally relevant cause of a particular effect leading to a violation of certain federal environmental statutes – namely, the National Environmental Policy Act (NEPA) (*Department of Transp. v. Public Citizen* (*Public Citizen*), 541 U.S. 752, 766 (2004)); and section 7 of the ESA (*National Ass'n of Home Builders v. Defenders of Wildlife* (*Home Builders*), 551 U.S. 644, 662 (2007)).  A federal district court in the Eastern District of California has recently adopted and applied this reasoning in analyzing section 9 "take" liability.  See *Natural Resources Defense Council v. Norton* (*NRDC*), 236 F.Supp.3d 1198, 1237-38 (E.D. Cal. 2017).  The reasoning the Supreme Court applied in those two cases should apply in this case as well.

### 1. *Public Citizen*: Agency's Non-Discretionary Action Does Not Trigger NEPA Requirement to Conduct Environmental Impact Analysis

In *Public Citizen*, the Federal Motor Carrier Safety Administration (FMCSA) was required by regulations of the Department of Transportation to register Mexican motor carriers for cross-border services as long as the carrier was willing and able to comply with various safety and financial responsibility rules.  *Public Citizen*, 541 U.S. at 766.  The agency did not have discretionary authority to deny the registrations.  At the same time, the National Environmental Policy Act (NEPA) requires federal agencies, in part, to analyze any environmental impact of an agency's actions.  *Id*. at 763-64.  Although FMCSA prepared an environmental analysis (EA) under NEPA, it did not incorporate analysis of increased cross-border operations into the EA, or analyze those impacts in more detail in an Environmental Impact Statement (EIS).  *Id*. at 765.

Relying, in part, on the "doctrine of proximate cause from tort law," the Supreme Court determined that FMCSA's failure to incorporate analysis of the increase in cross-border operations did not violate NEPA.  *Public Citizen*, 541 U.S. at 767-68.  The Court observed that the analysis requirement under NEPA is triggered when there is a "but for" causal relationship between the environmental effect and the alleged cause.  *Id*.  However, the sufficient causal connection does not exist if the agency "has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions."  *Id*. at 770.  In other words, FMSCA was not

required to include analysis of increased cross-border trucking operations because the Department

of Transportation regulations did not grant FMSCA any discretion regarding registration of motor

carriers entering into the United States; FMSCA only controlled the safety regulation of such

motor carriers, and was <u>mandated</u> to certify any motor carriers complying with the applicable

transportation regulations. *Id.* at 758-59, 768-69. Because FMSCA had "no ability categorically

to prevent the cross-border operations, the environmental impact of the cross-border operations

would have no effect on FMCSA's decision making – FMCSA simply lacks the power to act on

whatever information might be contained in the EIS." *Id.* at 768. Thus, because the causal

connection could not be made when an agency acted under a non-discretionary mandate of a

regulation, the court found it was not appropriate to hold that agency responsible for failing to

meet certain NEPA environmental reporting standards.

> ### 2. *Home Builders*: Non-Discretionary Agency Actions Do Not Trigger ESA's Section 7 Consultation Requirement

In *Home Builders*, the Supreme Court likewise determined that an agency's non-

discretionary act cannot be the proximate cause for environmental harm sufficient to trigger

section 7 of the ESA. *Home Builders,* 551 U.S. at 667-68. There, the EPA was required to

transfer waste-water discharge permitting authority under the National Pollutant Discharge

Elimination System (NPDES) to the State of Arizona under the Clean Water Act once Arizona

achieved certain conditions. *Home Builders*, 551 U.S. at 650. However, section 7 of the ESA

prescribes certain steps that federal agencies (including the EPA) must take in consultation with

U.S. Fish and Wildlife Service to ensure that their actions do not jeopardize endangered wildlife

and flora. *Id.* at 651-52. The EPA argued that section 7 did not apply to its actions under the

NPDES to transfer permitting authority to the state agency. *Id.* at 653-54.

In *Home Builders*, the Supreme Court looked to *Public Citizen* for guidance, noting "the

basic principle . . . that an agency cannot be considered the legal 'cause' of an action that it has no

statutory discretion *not* to take . . . ." *Home Builders*, 551 U.S. at 667-68 (emphasis in original).

The Court observed that when an agency is statutorily <u>required</u> to take certain actions (such as the

transfer of permitting authority under the Clean Water Act), it cannot be considered a legally relevant "cause" of the effect of that action on species protected by the ESA. *Id.* at 668, quoting *Public Citizen*, 541 U.S. at 770 ("'where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant "cause" of the effect'"). Based on this principle, the Supreme Court determined that section 7 of the ESA covers only discretionary agency actions and does not attach to actions like the NPDES permitting transfer authorization that the EPA was required by statute to undertake. *Id.* at 669. The Court observed that section 7 requires an agency to "insure" that the actions it authorizes are not likely to harm listed species or their habitats. *Id.* at 667. Thus, "when an agency is *required* to do something by statute, it simply lacks the power to 'insure' that such action will not jeopardize endangered species." *Ibid.* (emphasis in original).

### 3. Recent California Case Follows the Logic of *Public Citizen* and *Home Builders* in Finding That Section 9 "Take" Liability Does Not Attach to Non-Discretionary Actions

Last year, a district court in the Eastern District of California conducted precisely the analysis this Court should apply in this case, relying on *Public Citizen* and *Home Builders* in determining that a government agency was not the proximate cause of a "take" under section 9 of the ESA. *Natural Resources Defense Council v. Norton* (*NRDC*), 236 F.Supp.3d 1198, 1237-38 (E.D. Cal. 2017). In *NRDC*, the Bureau of Reclamation (Reclamation) was under a long-term water service contract for water deliveries from the Central Valley Project. Reclamation was alleged to have caused a "take" of certain ESA-listed salmon because Reclamation made various water deliveries to contractors, who in turn diverted the delivered water, causing conditions that killed the protected salmon in the area. *Id* at 1204-05.

The district court observed that although the ESA's purpose is designed to be "'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation[]' … this does not mean that there should be no 'line between those causal changes that may make an actor responsible for an effect and those that do not' in the context of Section 9 [of the ESA.]'" *NRDC*, 236 F.Supp.3d at 1238-39 (internal citations omitted). The court allowed the claim against the Reclamation to proceed to trial on the "narrow ground" the contract for water

deliveries could have allowed Reclamation to retain some discretion to require use of one point of diversion as opposed to another, and therefore a potential finding that Reclamation was the proximate cause for the "take." *Id*. at 1240. However, the court also recognized that Reclamation could not be the proximate cause of the "take" to the extent that the "take" occurred as a result of the agency implementing a <u>legally mandated</u> water delivery that was <u>non-discretionary</u>. *Id*. at 1239-40. Referencing *Public Citizen*, the district court remarked that it was not "appropriate to impose section 9 liability on a government agency for take caused by an action over which it has no control." *Id*. at 1239. It also cited to *Home Builders*' reliance on *Public Citizen*'s reasoning regarding the basic principle "'that an agency cannot be considered the legal "cause" of an action that it has no statutory discretion not to take . . . .'" *Id*. at 1237, quoting *Home Builders*, 551 U.S. at 667-68.

**C.    The Logic of *Public Citizen*, *Home Builders*, and *NRDC* Apply Here**

*Public Citizen*, *Home Builders*, and *NRDC* all establish that non-discretionary actions by an agency are not the proximate causes of effects that would otherwise subject the agency to specific responsibilities triggered by various environmental laws. Here, CDFW's actions are mandated by statute and are non-discretionary. CDFW is authorized to administer and enforce policies and provisions of the California Fish and Game Code (Code) and associated regulations. Cal. Fish & Game Code § 702. In order for commercial fishers to fish for Dungeness crab in California, they must obtain a commercial fishing license, a vessel permit, a trap permit, and a buoy tag from CDFW. Cal. Fish & Game Code §§ 7850, 8280, 8280.1, 8276.5(a)(3). The issuance of these license and permits (and tags) is governed by the Code, which <u>mandates</u> CDFW to issue the license and permits upon the applicant meeting certain conditions. For instance, the Code mandates CDFW to issue a commercial fishing license upon the applicant meeting certain qualifications. Cal. Fish & Game Code § 7852 ("The department *shall* issue a commercial fishing license . . . " (emphasis added)). CDFW then issues Dungeness crab vessel permits to only certain qualified persons who hold a validly issued commercial fishing license for use on qualifying vessels. Cal. Fish & Game Code § 8280.1 (West 2013). The Code also mandates CDFW to issue specified Dungeness crab trap limits for all California commercial Dungeness

crab vessel permit holders pursuant to the structure outlined by the Legislature. Cal. Fish & Game Code § 8276.5(a) (West Supp. 2018).

This Court should follow *NRDC*'s section 9 "take" analysis, which applied the logic of proximate cause liability laid out in *Public Citizen* and relied on by *Home Builders*. Just as the *NRDC* court recognized that the agency could not be the proximate cause of the "take" to the extent that the "take" occurred as a result of the agency implementing a legally mandated water delivery that was non-discretionary (see *NRDC*, 236 F.Supp.3d at 1239-40), any "take" of threatened or endangered whales or turtles that occurred here due to the presence of legally authorized California commercial Dungeness crab gear cannot be imputed to CDFW, whose only role of issuing licenses and permits was non-discretionary under law. Similar to *NRDC*, which analogized to *Public Citizen*, it is not appropriate here to "impose section 9 liability on a government agency for take caused by an action over which it has no control." *NRDC*, 236 F.Supp.3d at 1239. CDFW cannot be the proximate cause of any "take" of the listed whales or turtles as it has no statutory discretion not to issue the licenses and permits to qualified commercial fishers. Accordingly, CDFW cannot be responsible for "take" under section 9 that occurs due to entanglements of the listed species in commercial crab gear.

## III.  CBD HAS FAILED TO ESTABLISH CAUSATION AS ALL OF ITS CITATIONS ARE TO DISCRETIONARY AGENCY ACTION CASES

### A.  *Strahan* Is A Discretionary Agency Action Case And Is Also Not Binding Precedent

Plaintiff CBD relies on a First Circuit Court of Appeals case in support of its claim of CDFW's "take" liability. See CBD MSJ at 2, 16, 17, 18, 21, 23, 24, citing *Strahan v Coxe* (*Strahan*), 127 F.3d 155, 163 (1st Cir. 1997). In *Strahan*, the Commonwealth of Massachusetts authorized the use of "gillnets" and "lobster gear" in areas designated by the National Marine Fisheries Service (NMFS) as a "critical habitat" for the critically endangered Northern Right Whale. *Strahan*, 127 F.3d at 159. The First Circuit found, in part, that there was sufficient evidence to support plaintiff's claim that the State's permitting of fixed fishing gear may result in impermissible habitat modification to the whale's environment at Cape Cod Bay. *Id*. at 164-65.

1   As a result, the *Strahan* court found the State could be found liable for "take" under the ESA. *Id.*
2   at 170.

3       *Strahan*, however, is a decision of a different Circuit of Appeals than the Ninth Circuit and
4   is not binding upon this Court. *Strahan*, 127 F.3d at 172. *Strahan* is also a decision that was
5   issued in 1997, years before the U.S. Supreme Court's decisions in *Public Citizen* (2004) and
6   *Home Builders* (2007), and therefore did not receive the benefit of being able to follow the
7   Court's proximate cause analysis. It should be noted that the only other circuit opinion that CBD
8   relies on is an Eighth Circuit case from 1989 (*Defenders of Wildlife v. Administrator,*
9   *E.P.A.* ("*Defenders of Wildlife*"), 882 F.2d 1294, 1300 (8th Cir. 1989)) and thus faces the same
10  problem. And as seen below, the district court cases cited by CBD are either similarly outdated
11  or provide only a cursory reference to one of the two outdated circuit opinions.

12      Additionally, the *Strahan* case involves a discretionary agency action, which would permit
13  a finding of proximate cause by the agency in authorizing the action (as the *Strahan* court found).
14  Unlike the statutes that govern CDFW in this case, the regulations in *Strahan* gave discretion to
15  the state agency (the Massachusetts Division of Marine Fisheries or "DMF") in issuing permits
16  for the use of gillnets and lobster gear. Under the Massachusetts regulations, the Director of
17  DMF has the discretion to "attach *any* written conditions or restrictions to the permit deemed
18  necessary or appropriate for purposes of conservation and management or to protect the public
19  health, welfare and safety." 322 CMR section 7.01 (7) (1995 version) (emphasis added).
20  Additionally, other provisions of the permitting regulation dealing with the sale or distribution of
21  fish and shellfish provide discretionary authority to the Director. 322 CMR section 7.01 (3) and
22  (4).

23      As such, the language of thee statutes and regulations at issue in *Strahan* provided DMF the
24  ability to accept or reject applications for permits to fish based on DMF's (or the Director's)
25  discretion. *Strahan*, therefore, is missing the linchpin apparent in *Public Citizen*, *Home Builders*,
26  *NRDC*, and this case – an agency's lack of discretion to deny permits used for activities affecting
27  listed species. Because *Strahan* involved regulations that allowed DMF discretion in its
28  permitting decisions, the causal connection between DMF's actions and the effect of those actions

on the listed species is more direct and proximate. Accordingly, *Strahan* fails to support CBD's claim of causation in this case.

## B. All of The Cases Relied on by CBD Show Discretionary Agency Actions

Unlike this case where CDFW's actions are non-discretionary and mandated by law, CBD relies on various non-binding cases that show at best that the particular agency might be liable where it took discretionary action. For instance, CBD's reliance on an Eighth Circuit case in *Defenders of Wildlife* runs into similar problems as *Strahan* as it falls on the same sword of discretionary agency actions. CBD MSJ at 18, 19, 25, citing *Defenders of Wildlife,* 882 F.2d at 1300. In *Defenders of Wildlife*, the Eighth Circuit found that the EPA committed a "take" in violation of the ESA for its continued registration of strychnine, a highly toxic poison that farmers and ranchers used to control rodents but which also resulted in poisonings of endangered species. *Id.* at 1301. The registration statute that allowed EPA to approve an application for the pesticide registration provided discretionary powers to the EPA. As the Eighth Circuit observed, "[t]he EPA *may* approve an application for registration only after determining that when used in compliance with 'commonly recognized practice,' the pesticide will 'perform its intended function without unreasonable adverse effects on the environment.'" *Id.* at 1296 (emphasis added), citing 7 U.S.C. §§ 136a(c)(5)(C)-(D) (1982). In fact, not only does the registration statute require the EPA to first make these determinations before approving an application for registration, but the statute also enables the EPA to seek additional data from the applicant to make the necessary determinations. 7 U.S.C. § 136a(c)(2)(B) (1982). The registration statute, therefore, provides sufficient causal connection between the EPA and the toxic deaths with the endangered species because the statute allows EPA sufficient discretion to prevent approval of an application for strychnine registration.

Other cases relied on by CBD where "take" by an agency was found reveal the same characteristics of <u>discretionary</u> authority:

- CBD cites to *Loggerhead*, a Florida district court opinion in which the court found that the county was liable for "take" of threatened sea turtles when it allowed vehicles to drive on the beach at night. CBD MSJ at 18:14-15, citing *Loggerhead*

17

*Turtle v. County Council of Volusia County*, 896 F.Supp. 1170, 1181-82 (M.D. Fla. 1995). The court observed that the county director had the discretionary authority to close the beaches to vehicle traffic during high tide, or to regulate beach traffic as appropriate, but that "[n]evertheless, the evidence before the Court strongly suggests that this authority has not been exercised to prevent driving and parking within the prohibited areas of the 'conservation zone.'" *Id*. at 1174.

- CBD cites to *Holsten*, a Minnesota district court case in which the court found that state officials were liable for take of lynx by permitting licenses to trap in lynx habitat. CBD MSJ at 18, citing *Animal Protection Institute, Center for Biological Diversity v. Holsten*, 541 F.Supp.2d 1073, 1078-80 (D. Minn. 2008). The district court cited to the Minnesota statute granting the agency such authority. *Id*. at 1079. The operative Minnesota statute provided the agency with discretionary authority, stating, "[t]he commissioner *may* prescribe restrictions on and designate areas where gray and fox squirrels, cottontail and jack rabbits, snowshoe hare, raccoon, bobcat, red fox and gray fox, fisher, pine marten, opossum, and badger may be taken and possessed." (Minn. Stat. Ann. § 97B.605 (West 2005) (emphasis added).

- CBD cites to another district court case outside of Ninth Circuit jurisdiction in *Sierra Club*, where the South Carolina district court observed that the plaintiffs were "likely" to succeed on a claim that the state agency was liable for "take" of sea turtles when it authorized construction of a sea wall that interfered with the sea turtles' breeding patterns. CBD MSJ at 18, citing *Sierra Club v. Von Kolnitz,* 2017 U.S. Dist. LEXIS 128462 at *16-*18 (D.S.C., Aug. 14, 2017, No. 2:16-CV-03815-DCN). However, CBD fails to mention that the state agency board exercised its discretionary powers to initially authorize the sea walls for a one-year period, and then re-authorize the continuation of the sea wall experiment even though its own agency staff recommended removal of the walls. *Sierra Club v. Von Kolnitz*, 2017 U.S. Dist. Lexis 128462 at *3, *15, *17-*18, *21-*22, *24. The agency's actions

18

clearly show its discretionary authority to keep or dismantle the sea walls which
were found to interfere with the habitat of sea turtles.

- CBD cites to *Red Wolf*, to a North Carolina district court case in which the court
  found that plaintiffs were "likely" able to show a "take" of protected red wolves
  when the state agency authorized permits for coyote hunting in an area federally
  designated for the restoration of red wolves.  CBD MSJ at 18:7-10, citing *Red Wolf
  Coalition v. N.C. Wildlife Res. Comm'n*, No. 13-60-BO, 2014 U.S. Dist. LEXIS
  65601 at *20 (E.D.N.C. May 13, 2014).  CBD fails to mention that the state agency,
  as observed by the district court, authorized coyote hunting "during all seasons and
  at any time day or night," thereby increasing the likelihood that a red wolf will be
  shot.  *Id*. at *20.  Furthermore, the pertinent state statute in *Red Wolf* authorizing the
  agency to issue permits for hunting gives the agency discretionary authority.  N.C.
  Gen. Stat. Ann. § 113-274 (West 2013) ("Wildlife Resources Commission *may*
  issue the following permits . . ."), emphasis added.

- CBD cites to *Martin*, a Maine district court case that found the likelihood of "take"
  liability against the state based on its trapping regulations which resulted in
  incidental takes of the endangered Canada lynx.  CBD MSJ at 21, citing *Animal
  Welfare Institute v. Martin*, 588 F.Supp.2d 70, 98 (D. Me. 2008).  Again, the
  authority given to the state agency to issue trapping licenses is discretionary.  *See*
  Me. Rev. Stat. tit. 12, § 11101, emphasis added ("A resident or nonresident may
  apply for and the commissioner or the commissioner's authorized agent *may* issue a
  written license to hunt wild animals and wild birds").  The discretionary nature was
  also observed by the district court when it remarked that the state proffered no
  reason its regulations cannot be amended on an emergency basis.  *Id*. at 108.

- CBD also relies on a district court case in Idaho.  CBD MSJ at 18, citing *Ctr. For
  Biological Diversity v. Otter*, No. 14-00258-BLW, 2016 U.S. Dist. LEXIS 3958 (D.
  Idaho Jan. 8, 2016).  CBD relies on this case, which was a partial grant of CBD's
  motion for summary judgment, to show that a state official was found in violation of

19

section 9 for the take of four lynx by licensed trappers over a three year period. CBD MSJ at 22. However, the district court ultimately denied CBD's motion for summary judgment in its entirety after finding that there was no "take" liability for three of the four lynx and that the "take" of one lynx is insufficient to show that future ESA violations are likely in Idaho if the existing regulations remain in place. *Center for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW) 2018 WL 539329, at *3 (D. Idaho, Jan. 24, 2018). Additionally, the state statute provided discretionary authority to the state agency in granting licenses for trapping. *See* Idaho Code, § 36-103(b) ("Because conditions are changing and in changing affect the preservation, protection, and perpetuation of Idaho wildlife, the methods and means of administering and carrying out the state's policy must be flexible and dependent on the ascertainment of facts which from time to time exist and fix the needs for regulation and control of fishing, hunting, trapping, and other activity relating to wildlife, and because it is inconvenient and impractical for the legislature of the state of Idaho to administer such policy, it shall be the authority, power and duty of the fish and game commission to administer and carry out the policy of the state . . .."). Thus, the flexibility granted to the Commissioner in granting trapping licenses provided the context for the district court to find a "take" violation against the state agency.

- CBD cites to one other district court case in the Ninth Circuit's jurisdiction, an Oregon district court case, *Tidwell*, in which the court found that there was evidence establishing that livestock grazing conditions permitted by the Forest Service exceeded the standards in its federal incidental take statement and thus allowed for "take" in certain areas designated critical habitat for threatened steelhead. CBD MSJ at 18, citing *Oregon Natural Desert Ass'n v. Tidwell*, 716 F.Supp.2d 982, 1005 (D. Or. 2010). In that case, an incidental take process had already been established by the National Marine Fisheries Service (NMFS), as it issued to the Forest Service an incidental take statement in order to grant the Service an exemption for incidental

take of steelhead. *Id*. at 1005. The court observed that the Forest Service could be
liable for "take" in light of evidence demonstrating that the agency "was unable or
unwilling to conduct all monitoring and enforcement contemplated by the
[biological opinion] and [incidental take statement], but nevertheless issued grazing
authorizations." *Id*. at 1005, n. 8. However, no initial "take" analysis was
conducted by the court at this stage of the proceedings.

Accordingly, CBD's cases show at best discretionary agency actions where proximate
causation could be found. None of the cases are inconsistent with the Supreme Court's
determination in *Public Citizen* and *Home Builders* that an agency cannot be the proximate cause
of environmental effects that resulted from non-discretionary actions mandated to the agency by
law. As articulated by the court in *NRDC*, it is not "appropriate to impose section 9 liability on a
government agency for take caused by an action over which it has no control." *NRDC*, 236
F.Supp.3d at 1239.

## IV. EVIDENTIARY OBJECTIONS

Defendant Charlton H. Bonham, in his official capacity as Director of the California
Department of Fish and Wildlife, objects to evidence submitted by CBD in support of its motion
for summary judgment as follows:

### A. Exhibit 2 – Objection: Hearsay

In paragraph 3 of the declaration of Kristen Monsell, Exhibit 2 is identified as a "copy of
the March 2017 federal government report by the National Marine Fisheries Service 2016 West
Coast Entanglement Summary, received from the California Department of Fish and Wildlife in
response to a Public Records Act Request."

CBD obtains entanglement data used to support its motion from Exhibit 2. For example,
CBD uses this particular exhibit as the basis for its claimed number of reported entanglements.
Exhibit 2 is hearsay – an out of court statement being offered for the truth of the matter asserted.
Here, CBD uses this hearsay data in an effort to establish as a fact that a certain number of
entanglements have occurred. This is improper.

While the author of Exhibit 2 is known, the sources of the data are not traceable, and are not always known.  Indeed, the report itself affirms that its data is second-hand or third-hand information from other groups or from other individuals.  The source specifically stated that it received multiple reports of re-sightings of whales already reported as entangled.  Also, the source specifically indicates that whales are often entangled elsewhere, and then sighted off the coast of California – even though the entanglement was not related to California or fishing gear related to California.  CBD Exhibit 2 at p. 1.

Stated another way, this evidence is unreliable on the point for which it is offered, and therefore should not be considered on this motion.

**B.      Exhibit 8 – Objection: Hearsay**

In paragraph 9 of the declaration of Kristen Monsell, Exhibit 8 is identified as a "copy of the March 2016 federal government report by the National Marine Fisheries Service 2015 Whale Entanglements off the West Coast of the United States received from the California Department of Fish and Wildlife in response to a Public Records Act Request."

CBD obtains entanglement data used to support its motion from Exhibit 8.  For example, CBD uses this particular exhibit as the basis for its claimed number of reported entanglements.  Exhibit 8 is unreliable hearsay – an out of court statement being offered for the truth of the matter asserted.  Here, CBD uses this hearsay data in an effort to establish as a fact that a certain number of entanglements have occurred.  This is improper.

While the author of Exhibit 8 is known, the sources of the data are not traceable, and are not always known.  In fact, although reports of entanglements are solicited at the end of Exhibit 8 (on its last page), there is no requirement that anyone reporting an entanglement provide data that could help NOAA confirm the report – such as contact information for the reporting party.  Exhibit 8, therefore, is inherently unreliable, and it even admits as much when it states that "where entangled animals are observed and reported does not necessarily reflect where and when the entanglement originated."  CBD Exhibit 8 at p. 1.

### C. Exhibit 9 – Objection: Hearsay

In paragraph 10 of the declaration of Kristen Monsell, Exhibit 9 is identified as a "May 2018 federal government report by the National Marine Fisheries Service 2017 West Coast Entanglement Summary."

CBD obtains entanglement data used to support its motion from Exhibit 9. For example, CBD uses this particular exhibit as the basis for its claimed number of reported entanglements. Exhibit 9 is unreliable hearsay – an out of court statement being offered for the truth of the matter asserted. Here, CBD uses this hearsay data in an effort to establish as a fact that a certain number of entanglements have occurred. This is improper.

While the author of Exhibit 9 is known, the sources of the data are not traceable, and are not always known. In fact, although reports of entanglements are solicited at the end of Exhibit 9 (on its last page), there is no requirement that anyone reporting an entanglement provide data that could help NOAA confirm the report – such as contact information for the reporting party. Exhibit 9, therefore, is inherently unreliable, and it even admits as much when it states that "where entangled animals are observed and reported does not necessarily reflect where and when the entanglement originated." CBD Exhibit 9 at p. 1.

### D. Exhibit 12 – Objection: Hearsay

In paragraph 13 of the declaration of Kristen Monsell, Exhibit 12 is identified as a "June 2018 federal government report by the National Marine Fisheries Service Sources of Human-Related Injury and Mortality for U.S. Pacific West Coast Marine Mammal Stock Assessments, 2012-2016."

CBD obtains much of the data used to support its motion from Exhibit 12. For example, CBD uses this particular exhibit as the basis for its claimed number of reported entanglements. Exhibit 12 is unreliable hearsay – an out of court statement being offered for the truth of the matter asserted. Here, CBD uses this hearsay data in an effort to establish as a fact that a certain number of entanglements have occurred. This is improper.

While the author of CBD Exhibit 12 is known, the sources of the data are not traceable, and are not always known. Indeed, the report itself affirms that its data is second-hand or third-hand

23

information from other groups or from other individuals. "Sources of injury data include strandings, disentanglement networks, the public, researchers, and fishery observer programs." CBD Exhibit 12 at p. 1.

Stated another way, this evidence will not ever be admissible in evidence, and therefore should not be considered on this motion.

**E.     Exhibit 13 – Objection: Relevance, Lack of Foundation, Hearsay**

In paragraph 14 of the declaration of Kristen Monsell, Exhibit 13 is identified as a "copy of the National Marine Fisheries Service's records regarding 2015 entanglements off the U.S. West Coast received from the California Department of Fish and Wildlife in response to a Public Records Act request."

To be clear, this is not a document authored by the California Department of Fish and Wildlife; it is authored by National Marine Fisheries Service and transmitted to CBD by the California Department of Fish and Wildlife. There is no indication of where the data was obtained by National Marine Fisheries Service. However, other documents authored by the National Marine Fisheries Service contain second-hand accounts of sightings, with a danger of over-reporting. See, for example, objection to CBD Exhibit 12.

Because CBD has not explained what the data in Exhibit 13 is or how it was compiled by the National Marine Fisheries Service, this exhibit lacks foundation. Because the origin of the data is unknown, this document cannot be used to substantiate the numbers of entanglements, and is therefore irrelevant. Finally, because it is likely a document compiled from sightings made by others, the document consists of unreliable hearsay data that cannot be made admissible at the time of trial.

**F.     Exhibit 14 – Objection: Relevance, Lack of Foundation, Hearsay**

In paragraph 15 of the declaration of Kristen Monsell, Exhibit 14 is identified as a "copy of the National Marine Fisheries Service's records regarding 2016 entanglements off the U.S. West Coast received from the California Department of Fish and Wildlife in response to a Public Records Act request."

1    To be clear, this is not a document authored by the California Department of Fish and

2    Wildlife; it is authored by National Marine Fisheries Service and transmitted to CBD by the

3    California Department of Fish and Wildlife.  There is no indication of where the data was

4    obtained by National Marine Fisheries Service.  However, other documents authored by the

5    National Marine Fisheries Service contain second-hand accounts of sightings, with a danger of

6    over-reporting.  See, for example, objection to CBD Exhibit 12.

7        Because CBD has not explained what the data in Exhibit 14 is or how it was compiled by

8    the National Marine Fisheries Service, this exhibit lacks foundation.  Because the origin of the

9    data is unknown, this document cannot be used to substantiate the numbers of entanglements, and

10   is therefore irrelevant.  Finally, because it is likely a document compiled from sightings made by

11   others, the document consists of unreliable hearsay data that cannot be made admissible at the

12   time of trial.

13        **G.    Exhibit 15 – Objection: Relevance, Lack of Foundation, Hearsay**

14        In paragraph 16 of the declaration of Kristen Monsell, Exhibit 15 is identified as a "copy of

15   the National Marine Fisheries Service's presentation on 2018 whale entanglements off the U.S.

16   West Coast as of July 30, 2018."

17        There document does not indicate where the reports of entanglements came from, thus

18   depriving anyone from determining the validity of the reports and whether they were duplicate

19   reports of the same entanglement.  However, other documents authored by the National Marine

20   Fisheries Service contain second-hand accounts of sightings, with a danger of over-reporting.

21   See, for example, objection to CBD Exhibit 12.

22        Because CBD has not explained what the data in Exhibit 14 is or how it was compiled by

23   the National Marine Fisheries Service, this exhibit lacks foundation.  Because the origin of the

24   data is unknown, this document cannot be used to substantiate the numbers of entanglements, and

25   is therefore irrelevant.  Finally, because it is likely a document compiled from sightings made by

26   others, the document consists of unreliable hearsay data that cannot be made admissible at the

27   time of trial.  This final objection is significant.  Exhibit 15 shows that the National Marine

28   Fisheries Service could not confirm many of the claims of reported entanglements.  For example,

for gray whales (not at issue in this lawsuit) there were apparently 13 reports of entanglements, but only 11 were confirmed. Was this because the other two reports were repeated? Were they unreliable? Were they wrong? These are the types of uncertainties that the prohibition against hearsay is designed to address.

## **CONCLUSION**

The Supreme Court has laid out a road map for determining liability of a governmental agency in situations similar to those at issue in this case, declaring that the agency's actions must be established as the proximate cause of the effect. Sufficient causal connection does not exist if the agency is unable to prevent a certain effect because its limited statutory authority does not give it discretion to do so. A 2017 decision from the Eastern District of California involving "take" of an endangered species under section 9 of the ESA followed this road map in determining an agency lacked discretion and therefore was not liable. This Court should follow the same road map laid out by the Supreme Court, and grant summary judgment in favor of CDFW. CBD's sole cause of action against CDFW for "take" liability under the ESA must be dismissed with prejudice as CDFW's permitting authority is non-discretionary and therefore not the proximate cause for any "take" of protected species.

Dated: November 21, 2018                    Respectfully Submitted,

                                            XAVIER BECERRA
                                            Attorney General of California
                                            ANNADEL A. ALMENDRAS
                                            Supervising Deputy Attorney General


                                            */s/ Myung J. Park*
                                            _____
                                            MYUNG J. PARK
                                            Deputy Attorney General
                                            *Attorneys for Defendants*

Defendant's Opp to CBD's MSJ; Notice of Cross-MSJ; Cross-MSJ and MPA in Support  (3:17-cv-05685-MMC)