ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
Michael S. Dorsi (SBN 281865)
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone:  (415) 510-3802
Fax:  (415) 703-5843
E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Defendant Charlton H. Bonham*

GLEN H. SPAIN (CSB #88097)
PO Box 11170
Eugene, OR 97440-3370
Telephone: (541) 689-2000
Email: fish1ifr@aol.com
*General Counsel and Attorney for Intervenor-Defendants Pacific Coast Federation of Fishermen's Associations (PCFFA) and Institute for Fisheries Resources (IFR)*

KRISTEN MONSELL (SBN 304793)
Email: kmonsell@biologicaldiversity.org
CATHERINE KILDUFF (SBN 256331)
Email: ckilduff@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150

DEAN S. KRISTY (SBN 157646)
Email: dkristy@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350
*Attorneys for Plaintiff
Center for Biological Diversity*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br><br>                    Plaintiff,<br><br>v.<br><br>**CHARLTON H. BONHAM, in his official capacity as Director of the California Department of Fish and Wildlife,**<br><br>                    Defendant,<br><br>and<br><br>**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATION AND INSTITUTE FOR FISHERIES RESOURCES,**<br><br>                    Intervenor-Defendants. | Case No. 3:17-cv-05685-MMC<br><br>**THIRTEENTH<br>POST-STAY JOINT STATUS REPORT**<br><br>Judge:       Hon. Maxine Chesney<br>Trial Date:   None scheduled<br>Action Filed:  October 3, 2017 |

Plaintiff Center for Biological Diversity (Plaintiff or Center), Defendant Charlton H. Bonham, in his official capacity as Director for the California Department of Fish and Wildlife (Defendant or Director), and Intervenor-Defendants Pacific Coast Federation of Fishermen's Associations (PCFFA) and the Institute for Fisheries Resources (IFR) (collectively, the "Parties") respectfully submit this *thirteenth* post-stay joint status report pursuant to the Court's November 16, 2019 Order (Dkt. No. 72).

**BACKGROUND**

Plaintiff filed a complaint on October 3, 2017, alleging that Defendant has caused and is causing the "illegal 'take' of threatened and endangered humpback whales, endangered blue whales, and endangered Pacific leatherback sea turtles." (Dkt. No. 1.)  Plaintiff's complaint challenged Defendant's "authorization, permitting, licensing, overseeing, and management of the California commercial Dungeness crab fishery," which Plaintiff alleged "is killing, injuring, harming, capturing, and otherwise causing 'take' of humpback whales, blue whales, and leatherback sea turtles in violation of" Section 9 of the Endangered Species Act.  Id.; 16 U.S.C. § 1538.

Defendant filed an answer to Plaintiff's complaint on November 17, 2017, admitting and denying certain of Plaintiff's allegations. (Dkt. No. 15.)  After successfully intervening, Intervenor-Defendants filed an answer to Plaintiff's complaint on April 16, 2018, incorporating Defendant's responses in its answer, and admitting and denying certain of Plaintiff's allegations. (Dkt. No. 41.)

The Parties filed cross-motions for summary judgment in this case and appeared for oral argument on the motions on February 22, 2019.  After the matter was deemed submitted, Defendant requested that the Court hold off on a ruling pending further settlement discussions.  Those further settlement discussions were fruitful.  The Parties submitted a Stipulation and Order Staying the Case, which this Court signed on March 26, 2019. (Dkt. No. 72.)

The parties later stipulated to extend the original stay, and that original stay was extended through this Court's Order of November 16, 2020.  (Dkt. 80.)  The November 16, 2020 Order Staying the Case required the Parties to submit a joint status report every six months as the Parties

work through their settlement commitments.

**CURRENT STATUS**

Since the stay was implemented, the California Department of Fish and Wildlife (CDFW) continued substantial progress toward its settlement obligations and has outlined those steps in the previous post-stay joint status reports.

The update presented below covers activities undertaken or reported by CDFW since the last update (Dkt. 86).

**I.    RISK ASSESSMENT STEPS**

CDFW performed entanglement risk assessments on the following days:

- November 21, 2024
- December 6, 2024
- December 20, 2024
- January 22, 2025
- February 13, 2025
- March 17, 2025
- April 3, 2025
- April 21, 2025

These risk assessments were supported by CDFW aerial surveys undertaken on the following days:

- November 8, 2024
- December 1, 2024
- December 10, 2024
- December 11, 2024
- March 8, 2025
- March 20, 2025
- March 25, 2025

For each risk assessment, CDFW compiled and distributed data gathered from USCG, NOAA, CDFW landings, whale watch cruises, fishing fleet vessel surveys, independent researchers, NMFS scientific surveys, and fishery and whale experts. Each risk assessment was conducted in coordination with the Working Group. Meetings were implemented through fully remote access. Also, all materials and outcomes from the Working Group risk assessment meetings are available on the Department's Whale Safe Fisheries website and noticed through the Whale Safe Fisheries listserv.

II.     **Management Action**

CDFW took management action to reduce entanglement risk through the following measures:

- CDFW delayed the opening of the commercial season in Fishing Zones 1-2 and continued the delay in Zones 3-6 on November 21, 2024. Also on November 21, 2024 CDFW continued a crab trap prohibition in Zones 3-4.
- CDFW continued a commercial delay in all Fishing Zones and a crab trap prohibition in Zones 3-4 on December 6, 2024.
- CDFW opened the commercial crab season with a 50% Gear Reduction in Zones 3-6 on January 5, 2025. A 25% Gear Reduction for Fishing Zones 1-2 was also implemented and was subject to a delayed opening due to meat quality until January 15, 2025.
- CDFW continued all previously implemented Gear Reductions in the commercial fishery on January 16, 2025.
- CDFW continued all implemented Gear Reductions in the commercial fishery on February 13, 2025.
- CDFW continued all implemented Gear Reductions in the commercial fishery on March 17, 2025.
- CDFW continued the 25% Gear Reduction in Fishing Zones 1-2 and implemented a 30-fathom Depth Constraint on April 3, 2025.

- CDFW continued the 50% Gear Reduction along with a 30-fathom Depth Constraint in Fishing Zone 3 and implemented season closure for the commercial fishery in Zones 4-6 on April 3, 2025.
- CDFW closed the commercial fishery in Zone 3, effective May 1, 2025, and continued Gear and Depth Constraints in Zones 1-2 on April 21, 2025.
- CDFW implemented a Crab Trap Prohibition for the recreational fleet in Fishing Zone 3, effective May 1, 2025, on April 21, 2025.

In addition, effective March 8, 2024, CDFW amended section 132.2 of Title 14 of the California Code of Regulations on an emergency basis to improve and expand opportunities for retrieval of lost, damaged, abandoned or otherwise derelict commercial Dungeness crab traps. The amended regulations allow permitted Dungeness crab vessels to retrieve an unlimited number of lost or derelict traps as authorized by the Director under the Risk Assessment and Mitigation Program (RAMP). CDFW subsequently initiated a regular rulemaking to permanently expand retrieval of lost gear via public notice on September 27, 2024. The changes included enhanced reporting requirements to further improve accounting and removal of lost traps. These new requirements became permanent and effective on April 14, 2025.

III. **REGULATORY AMENDMENTS TO RISK ASSESSMENT AND MITIGATION PROGRAM**

On April 5, 2024, CDFW provided public notice for proposed amendments to the RAMP regulations. A public hearing was held virtually on Tuesday, May 21, 2024. Due to the large volume of public comments and substantive input from stakeholders, CDFW undertook a reevaluation of several aspects of the proposed rulemaking, provided an additional 45-day public comment period beginning December 6, 2024, as well as another public hearing on January 21, 2025. CDFW submitted a revised version of the RAMP amendments to the Office of Administrative Law on April 4, 2025.

The RAMP amendments would modify regulations that originally went into effect on November 1, 2020, based on four seasons' worth of implementation experience, as well as feedback from the Working Group and other stakeholders. The RAMP amendments will provide

new specifications for Dungeness crab fishing gear identification, clarify management areas, adjust definitions of Confirmed Entanglements and calculations to reflect improved gear identification, adjust Management Action timing with additional automatic delays/closures, clarify reporting requirements for electronic monitoring, and specify limitations and conditions in authorizing Alternative Gear. Additionally, the RAMP amendments would provide CDFW necessary regulatory authority to implement potential future measures outlined in the federal Incidental Take Permit and associated Conservation Plan.

IV.    UPDATES TO OTHER STEPS UNDERTAKEN

    A.    **Conservation Plan**

As noted in earlier reports, CDFW submitted its first draft Conservation Plan to the National Marine Fisheries Service (NMFS) on May 15, 2020. CDFW continued work on the draft Conservation Plan during this reporting period based on a broad array of public comments and comments from NMFS. CDFW submitted a revised draft Conservation Plan in January 2024 for additional review and comments from NMFS. CDFW spent considerable time reviewing and addressing those comments during most of 2024. CDFW subsequently submitted a final draft ITP application to NMFS on December 21, 2024 and is currently awaiting further guidance from NMFS.

    B.    **Coordination with Working Group**

All CDFW risk assessments, as noted above, were conducted in coordination with the Working Group. CDFW continued to support Working Group meetings, facilitating fully remote meetings and hosting an annual meeting of the Working Group. The materials and outcomes from the Working Group risk assessment meetings are available on CDFW's Whale Safe Fisheries website (https://wildlife.ca.gov/Conservation/Marine/Whale-Safe-Fisheries) and noticed through the Whale Safe Fisheries listserv.

    C.    **Alternative Gear**

CDFW staff continues to participate in regular discussions with the National Marine Sanctuary Foundation and interested stakeholders to discuss ongoing projects to test Alternative

Gear types. CDFW remains committed to aiding in recruiting commercial Dungeness crab fishers for gear testing programs.

Notably, CDFW continues to expand and facilitate testing and development of Alternative Gear through the Experimental Fishing Permit (EFP) program. Since fully implementing the EFP program in April 2022 the California Fish and Game Commission has approved CDFW's issuance of four EFPs which include testing of one or more pop-up devices. Of the three pop-up EFPs issued thus far, nine pop-up devices from seven different manufacturers have been approved for testing. As of April 2025, four EFPs have been amended to allow a total of 120 fishers to participate, further expanding the state's efforts to test innovative gear types that do not require the use of a persistent vertical line.

### D.     Take Reduction Team

In April of 2024, CDFW was informed by NMFS that the California commercial Dungeness crab pot fishery would be included in a Take Reduction Team (TRT) to develop a Take Reduction Plan for Central American and Mainland Mexico humpback whales, and North Pacific blue whales. As required by the Marine Mammal Protection Act (MMPA), the Take Reduction Plan will reduce incidental mortality and serious injury to humpback whales via take reduction measures, including regulatory and/or voluntary measures for bycatch reduction. CDFW has also been notified, however, that the inclusion of Dungeness crab will not occur until additional analysis is completed by NMFS. Although no specific timeline has been provided, the TRT is expected to occur sometime in early 2026.

### V.     NO OBJECTION TO FILING JOINT STATUS REPORT

The Center, PCFFA and IFR do not have direct knowledge of all of the actions outlined above, but have read this report and do not object to it being filed as a Joint Status Report.

### **The Center's Position**

Total West Coast whale entanglements confirmed in 2024 surpassed all years since 2018; the California commercial Dungeness crab fishery entangled at least five whales in 2024. In April 2025, NMFS announced that it expects this fall to convene scientists to estimate the unobserved

mortalities in state Dungeness crab fisheries. The estimates of unobserved mortality, combined with the confirmed entanglements, will be used in the TRT meetings, to address the incidental take permit, and to update the state habitat conservation plans.

The high number of entanglements in 2024 despite CDFW's efforts show the urgency of authorizing and using pop-up fishing gear, which does not require persistent vertical lines. This is a win-win solution, in that fishing can continue with greatly reduced risk to whales.

**PCFFA/IFR's Position**

While PCFFA/IFR have no objection to the other information in this Joint Status Report, above, PCFFA/IFR are also filing their "Supplemental Information" report with their own position statement with the Court for its information, attached as Exhibit 1 herein.

Dated:  May 16, 2025                                     Respectfully submitted,

*/s/ Michael S. Dorsi*
Michael S. Dorsi
Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
*Attorney for*
*Defendant Charlton H. Bonham*

*/s/ Catherine Kilduff*
Catherine Kilduff
*Attorney for Plaintiff*
*Center for Biological Diversity*

*/s/ Glen Spain*
Glen Spain
*Attorney for Intervenors Pacific Coast*
*Federation of Fishermen's Association and*
*Institute for Fisheries Resources*

**ATTESTATION**

I, Michael S. Dorsi, am the ECF user whose identification and password are being used to file this Joint Status Report.  In compliance with L.R. 5-1(i), I attest that the other signatories have concurred in this filing.

 Dated:  May 16, 2025

*/s/ Michael S. Dorsi*



# EXHIBIT 1

May 16, 2025

## PCFFA/IFR Supplemental Information to the 13th Post-Stay Joint Status Report in Case No. 3:17-cv-05685-MMC

**Introduction:**
The Pacific Coast Federation of Fishermen's Associations (PCFFA) and Institute for Fisheries Resources (IFR) provide and reiterate the following position statement and report:

PCFFA/IFR agrees that the California Department of Fish and Wildlife (CDFW) has continued substantial progress toward its Settlement Agreement obligations as outlined in this post-stay Joint Status Report.

PCFFA/IFR would like to further report that both PCFFA and IFR and fleet representatives are actively engaged in the Working Group and participating fully in the process of updating RAMP regulations. It is imperative to recognize that the California Commercial Dungeness Crab Fleet continues to endure, and has and continues to comply with extensive management actions, which have imposed a substantial economic cost on small family businesses and California port communities, all in a good-faith effort to mitigate the risk of marine mammal entanglements.

1

While fishermen are doing their part, we must still insist that these sacrifices be based on sound science and genuinely directed at protecting endangered whales, rather than merely fulfilling procedural requirements or Settlement Agreement conditions that are without meaningful and proven conservation impacts.

CDFW is moving forward on updating and revising Risk Assessment Mitigation Program (RAMP) Regulations and PCFFA/IFR has been engaged and supportive of the process, providing input and public comments from the California Commercial Fishing Fleet. CDFW has also reported that they revised the draft Conservation Plan (CP) and Incidental Take Permit Application (ITP) as required by the Settlement Agreement and submitted the documents in December 2024.

However, in April 2024, NOAA Fisheries announced the inclusion of the California commercial Dungeness crab pot fishery in a Federal Take Reduction Team to develop a Take Reduction Plan -- a step that PCFFA/IFR believes effectively supersedes and obsoletes certain language outlined in the terms of the Settlement Agreement, based on new and emerging information.

**It is PCFFA/IFR's continuing position that:**

1. *CBD v. Bonham* was stayed in part because "interim measures are incomplete in some respects, requiring further scientific analysis, development of the process by which threat levels will be evaluated and responded to, and implementation of rulemaking to provide the necessary regulatory framework" [1]

2. Interim and arbitrary language from the 2019 Settlement Agreement[2] has unjustifiably been carried over into the Triggers for Management Action sections of the Risk Assessment Mitigation Program (RAMP)[3], drafts of future regulations (RAMP 2.0)[4] and the January 2024 Draft Conservation Plan (CP)[5] that will be the basis for an Incidental Take Permit (ITP).

3. Triggers for management action, including marine life concentrations and impact scoring language within the Settlement Agreement, were NOT based on scientific or technical analysis but were established solely as interim, arbitrary measures intended to prevent extended litigation and avoid a potential injunction to shut down the California Dungeness Crab fishery in 2019.

-2-

---

[1] Case 3:17-cv-05685-MMC Document 71 Filed 03/26/19 Page 3 line3-7.
[2] Exhibit A (c)(iii)(1), Exhibit A (c)(iii)(2) and Appendix A (2a), Appendix A (2b).
[3] https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=184189&inline
[4] https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=221966&inline – note: an updated version is in progress per CDFW.
[5] https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=219843&inline – note: an updated version is in progress per CDFW.

4. These arbitrary triggers are no longer valid and should not continue to drive fishery management without reevaluation based on new and emerging information.

**New and Emerging Information:**

1. **Implementation of a Federal West Coast Take Reduction Team:**
   - To resolve claims in the matter of another lawsuit - *Center of Biological Diversity v. Raimondo* (3:22–cv–00117–JD), NOAA Fisheries committed to establishing a Take Reduction Team (TRT) to address the incidental mortality and serious injury of humpback and blue whales in several trap/pot fisheries along the West Coast of the U.S.[6]

   - NOAA Fisheries has preliminarily decided that the TRT will address 3 strategic marine mammal stocks (i.e., Central America/Southern Mexico humpback whales, Mainland Mexico humpback whales, and Eastern North Pacific blue whales) and 5 commercial fisheries, including the California Dungeness crab pot fishery.

   - West Coast Meetings for the TRT were originally scheduled for April 2025- November 2025, but now CDFW reports (see the statement above) that those dates have been cancelled, and: "Although no specific timeline has been provided, the TRT is expected to occur sometime in early 2026." And even that vague later date is apparently dependent upon NOAA completing certain studies that may or may not ever be completed, given current personnel and management uncertainties within NOAA. *Further delay is not an acceptable outcome.* Every delay in the TRT process penalizes our fisheries and the communities which rely upon those fisheries for their livelihoods. *It is imperative that CDFW continue to urge NOAA to complete its required studies and to convene the TRT as soon as possible!*

   **Take Reduction Team Purpose, Goals, Process and Content:[7]**
   Purpose:
   - Take Reduction Teams have been established around the country with the purpose of developing and implementing take reduction plans to help recover and prevent the depletion of strategic marine mammal stocks that interact with Category I and II fisheries.

   Goals:

---

[6] https://www.fisheries.noaa.gov/west-coast/marine-mammal-protection/west-coast-take-reduction-team
[7] https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-take-reduction-plans-and-teams#trt-priorities

3

- The immediate goal of a take reduction plan is to reduce, within six months of its implementation, the incidental mortality or serious injury of marine mammals from commercial fishing to less than the Potential Biological Removal (PBR) level.

- The long-term goal is to reduce, within five years of its implementation, the incidental mortality and serious injury mortality of marine mammals from commercial fishing operations to insignificant levels, approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and existing state or regional fishery management plans.

Process:
- Take Reduction Teams consist of a balance of representatives from the fishing industry, Fishery Management Councils, State and federal resource management agencies, scientific community and conservation organizations.

- The Team has 6 months to reach consensus on a Take Reduction Plan (Plan) and then submit it to NOAA Fisheries. NOAA Fisheries then has 60 days to publish a draft Plan, including any proposed changes to the Plan. The public then has an opportunity to review and provide comments on both the Plan and the proposed regulations for implementing the Plan.

Content:
- Each take reduction plan MUST include the following:
    - Review of the final stock assessment report for each marine mammal addressed by the Plan and any substantial new information.
    - Estimate of the total number and, if possible, age and gender, of animals from the stock that ar incidentally killed or seriously injured each year during the course of commercial fishing operations, by fishery.
    - Recommended regulatory or voluntary measures for the reduction of incidental mortality and serious injury.
    - Recommended dates for achieving the specific objectives of the plan.

2. **Proposed Reclassification of the CA Dungeness Crab Pot Fishery:**
    - The MMPA requires NOAA Fisheries to publish an annual list of commercial fisheries and classify each fishery based on whether it has frequent (Category I), occasional (Category II), or remote likelihood (Category III) of incidental mortality and serious injury of marine mammals.[8]

---

[8] https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-list-fisheries#fishery-classification-criteria

4

- In September 2024, NOAA/NMFS proposed reclassification of the Category I CA Dungeness crab pot fishery to a Category II fishery on the proposed Marine Mammal Protection Act (MMPA) List of Fisheries for 2025 based on the most recent estimate of annual mortality and serious injury. [9]

-4-

3. **Best Available Science:**
    - The Marine Mammal Protection Act of 1972 ("MMPA") was the first Congressional act to include a "best available science" mandate. Though MMPA established a broad prohibition against the "taking" of marine mammals, it provided one important exception. Under this law, wildlife agencies may grant exceptions to the taking prohibition provided they determine, using the best available scientific evidence, that such a taking would have only a negligible impact on marine mammal populations or stocks.[10]

    - The Endangered Species Act ("ESA") incorporated the "best available science" mandate in 1973. The ESA requires the Secretary of Commerce to list a species as endangered or threatened "solely on the basis of the best scientific and commercial data available." In order to determine what conservation efforts are in order under the ESA, the information leading to this determination must be complete and of high quality.[11]

    - Best Available Science considerations are included in the Settlement Agreement of 03/26/19:
        > "The parties agree the provisions contained in Appendix A will be submitted to the Working Group, and the Department will advocate that the Working Group consider them for incorporation into the RAMP rule unless the Working Group demonstrates a different approach protects listed species based on the best available science. [12]

    - CDFW has defined best available science as that which is relevant, inclusive, objective, open, and timely.[13]

Information that will be presented to the TRT is including but not limited to Stock Assessments, Distinct Population Segment analysis, Serious Injury and Mortality rates, Potential Biological

---

[9] https://www.federalregister.gov/documents/2024/09/24/2024-21835/marine-mammal-protection-act-list-of-fisheries-for-2025

[10] https://environs.law.ucdavis.edu/sites/g/files/dgvnsk15356/files/media/documents/ENV-30-2-vellucci.pdf  (pg. 282)

[11] https://environs.law.ucdavis.edu/sites/g/files/dgvnsk15356/files/media/documents/ENV-30-2-vellucci.pdf  (pg. 283)

[12] Case 3:17-cv-05685-MMC Document 71 Filed 03/26/19 -Exhibit A, Section II.

[13] January 2024 Draft Conservation Plan Pg. 79.

5

Removal levels, and will be a better reflection of best available science as that which is relevant, inclusive, objective, open, and timely than the arbitrary and interim terms of the 2019 Settlement Agreement.

The work of the TRT will inform the Working Group and the ITP, and it should supersede Settlement Agreement language and release CDFW from using the specific Triggers for Management Action language in the Settlement Agreement in any future regulations or the ITP application.

**Triggers for Management Action: Marine Life Concentrations:**
The 2019 Settlement Agreement set arbitrary whale presence triggers for management action (e.g., 20 whales detected or a 5-whale weekly average).[14] Current RAMP and draft RAMP 2.0 regulations, along with the 2024 Conservation Plan, still rely on these arbitrary, interim triggers.

PCFFA's Position:
- Marine Life concentration triggers should be re-evaluated based on updated stock assessment data and rising humpback populations since 2019.
- Updated triggers should allow for continual adjustment based on best available science and should not be fixed in regulations at a specific number.

**Triggers for Management Action: Impact Scoring:**
The Settlement Agreement introduced scoring for confirmed entanglements and assigns a score of 1.0 for entanglements confirmed in California Dungeness Crab Gear, and a score of .50 for confirmed entanglements in unknown gear.[15] This scoring has evolved and continues to evolve with the expectation of future line marking requirements, however these numbers are not based on serious injury or mortality, or PBR as defined by NOAA.

PCFFA's Position
- Impact Scoring language and "take" definitions in California regulations and the California Dungeness Crab Fishery ITP should mirror Federal definitions for "take" and should consider mortality and serious injury and PBR when determining how to calculate impact and trigger management actions.

**Conclusion:**
As Intervenors and signatories to the 2019 Settlement Agreement, PCFFA/IFR cannot support the uncritical continuation of specific triggers for management actions derived from arbitrary and interim standards meant only to avoid extended litigation and a potential shutdown of the California Dungeness Crab fishery in 2019.

---

[14] Case 3:17-cv-05685-MMC Document 71 Filed 03/26/19 Exhibit A-(I.c.iii.2) Appendix A. (2a).
[15] Case 3:17-cv-05685-MMC Document 71 Filed 03/26/19 Exhibit A-(I.c.iii.1) Appendix A. (2b).

It is our position that the management of California Dungeness Crab Fishery should be based on actual data vetted as sufficient to protect whales, while also protecting the cultural and economic contributions of the Dungeness Crab fleet to California.

We support CDFW's continuing work on updating the Conservation Plan to obtain the ITP and to the process of updating RAMP regulations to RAMP 2.0, but will advocate for submission timing that allows revisions to triggers for management actions to be updated based on current best available science and the completion of the TRT process. *That TRT process should be convened and completed as soon as possible.*

We still believe that CDFW is not legally obligated under the Settlement Agreement language to adopt the same specific triggers into its Conservation Plan as in the Settlement Agreement's interim measures, and that doing so is not in accordance with the best available science.

*****

2025 May CBDvBonham Statement